# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-1326V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| | \* | |
| JERMAINE A. BEALE, | \* | Chief Special Master Corcoran |
| | \* | |
| Petitioner, | \* | Filed:  April 8, 2026 |
| | \* | |
| v. | \* | |
| | \* | |
| SECRETARY OF HEALTH AND | \* | |
| HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*William E. Cochran, Jr*., Black McLaren Jones Ryland & Griffee, P.C., Memphis TN, for Petitioner

*Alyssa M. Petroff,* U.S. Department of Justice, Washington, DC, for Petitioner.

### ENTITLEMENT DECISION[1]

On August 16, 2023, Jermaine Beale filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petition (ECF No. 1). Petitioner alleges his receipt of an influenza ("flu") vaccine on October 27, 2021, caused him to develop Guillain-Barre syndrome ("GBS"), although he has since revised his claim to allege the injury of chronic immune demyelinating polyneuropathy ("CIDP"). *See* Petitioner's Motion, filed Aug. 1, 2025 (ECF No. 32) ("Br.") at 1.

I ordered the parties to brief the claim for resolution via ruling on the record, and they have now completed that process. *See* Br.; Respondent's Response, dated Set. 15, 2025 (ECF No. 33) ("Opp."); Petitioner's Reply, filed Sept. 25, 2025 (ECF No. 34) ("Reply"). Now, for the reasons

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

set forth below, I deny entitlement. Petitioner's injury, however characterized, likely predated vaccination, and thus could not have been caused by it.

## I.      Factual History

*Relevant Pre-Vaccination History*

In the spring of 2021 (and thus several months prior to vaccination), Mr. Beale went to a primary care facility, both to establish a treatment relationship but also for evaluation of left foot pain he reported had begun four days prior. Ex. 21 at 21. His medical history was noted to include a wide variety of comorbidities—obesity, gout, type 2 diabetes mellitus with hyperglycemia without long-term current use of insulin, joint pain, and hypertensive urgency. *Id*. That history also highlighted Petitioner's treatment for gout, and the fact that he was then experiencing pins and needles sensations in his feet plus pain since March of that year. *Id.* at 23. Exam revealed no visible abnormalities in his feet, and Petitioner was prescribed medications for several of his comorbid illnesses and conditions. *Id.* at 22, 25.

In early June 2021, Petitioner returned to the same care facility for a follow-up appointment. Ex. 21 at 11. He now reported that his bilateral foot pain had worsened, and that his "legs fel[t] heavy from the knees down especially at nighttime when trying to sleep [and] at times he [did] feel pins-and-needles in his legs." *Id*. at 12, 16. He also noted "discomfort from the ball of his foot to the heel of his foot." and that his pain was worse in the mornings. *Id*. Petitioner was now assessed (in addition to what had been previously noted) with myalgia due to statin and bilateral plantar fasciitis. *Id*. at 14–15.

Then, less than two weeks before the vaccination at issue (specifically on October 15, 2021), Mr. Beale took himself to an urgent care center for treatment of lower extremity pain and "Neuro Complaints." Ex. 14 at 3. He now complained of pain and numbness in his feet, plus weakness in his legs and a sensation of "walking on marshmallows." *Id*. at 3, 5. He also acknowledged discontinuing his blood pressure medication due to leg discomfort. *Id*. at 3. On exam, he exhibited tenderness and swelling in his feet and abnormal neurological sensations. *Id*. at 4. Although a blood glucose test showed normal results, a nurse practitioner suspected diabetic neuropathy and prescribed gabapentin for petitioner's symptoms. *Id*. at 5.

*Vaccination and Alleged Neurologic Injury*

On October 27, 2021, Petitioner (then 40 years old) visited primary care physician ("PCP") Sameh Askandar, M.D., to establish a treatment relationship, and at this time he discussed his recent history of "nerve issues" and leg pain. Ex. 2 at 24. Dr. Askandar suggested lifestyle modifications and prescribed gabapentin for diabetes pain treatment. *Id*. at 26–32. During this visit,

2

Mr. Beale received a flu vaccine in his left deltoid (as well as a version of the pneumococcal vaccine not covered by the Vaccine Program, in his other arm). *Id*. at 32.

Two weeks later, on November 10, 2021, Petitioner visited an urgent care clinic and complained of a three-day history of left ankle pain "bad enough to shoot up his left leg to his left knee and sometimes to the left hip." Ex. 9 at 5. He noted he was already being treated for foot pain, and that his symptoms had "happen[ed] before and [he saw] his PCP who increased his Gabapentin." *Id.* A physical exam was normal, apart from swelling and reduced range of motion in his left ankle. *Id.* at 6. A nurse practitioner attributed Petitioner's symptoms to gout, and he was prescribed an anti-inflammatory drug and encouraged to follow up with his PCP. *Id.* at 7. Petitioner subsequently returned to his home in Memphis, TN, and there visited his PCP, Dr. Askandar, on November 16, 2021. Ex. 2 at 18. Petitioner now described one episode of "sudden left flank pain" and hematuria, which Dr. Askandar attributed to gout-related kidney stones. *Id*. at 21.

At the end of November (and while travelling for business), Petitioner took himself to an urgent care facility in Chesapeake, Virginia, for treatment of a five-day history of worsening ankle pain that he deemed "consistent with prior gout flares," and which he proposed could be associated with the gout medication he was taking. Ex. 4 at 1. Petitioner also reported swelling, nausea, chills, and fatigue, he had a slightly elevated temperature and mild tachycardia, and a swollen left ankle that was "[n]otably warm to touch." *Id.* Lab testing revealed leukocytosis, and he was deemed to have an increased risk of blood clots. *Id.* at 1–2. Petitioner received medication at this urgent care visit, and was advised to go to an emergency room ("ER"), although he did not do so despite worsening symptoms. *Id*. at 2, 3.

Petitioner thereafter returned to Memphis and visited Dr. Askandar. Ex. 2 at 11. He reported the same set of symptoms he had addressed at the urgent care visit, noting that latest ankle pain flare-up "began Friday [November 26, 2021]," "over the Thanksgiving holiday," when he first noticed swelling and pain, although symptoms had been "*ongoing for about the last year*." *Id*. (emphasis added). Petitioner exhibited elevated blood pressure and heart rate, and his lab work showed elevated uric acid, elevated lymphocytes, and high blood sugar, but his physical exam was largely normal. *Id*. at 11–13. Dr. Askandar documented chronic gout, and prescribed medications specific to its treatment. Ex. 2 at 13, 14. Petitioner returned to Dr. Askandar a week later complaining of gout symptoms in his knee. Ex. 2 at 6 (December 7, 2021 visit notes). On exam, he displayed mild tenderness and swelling in his left leg up to the knee joint. *Id*. at 7. Petitioner was prescribed an anti-inflammatory (meloxicam) and instructed to continue with his other medications and lifestyle modifications. *Id*. at 7–9.

In mid-December 2021, Mr. Beale sought to establish care with a different PCP, Dr. Ramune Filipcic. Ex. 5 at 78. Petitioner now reported to Dr. Filipcic that he had been "[d]iagnosed

3

with DVT [deep vein thrombosis][3] on 12/7," (although there is no filed medical record evidence of this diagnosis). *Id.* He also stated that his leg symptoms had improved, but that he continued to have difficulty ambulating due to swelling and pain. *Id*. Petitioner also reported respiratory symptoms with a three-week history of dry cough and episodic shortness of breath. *Id*. A physical exam revealed tenderness in Petitioner's left calf but no other abnormalities, and Dr. Filipcic recommended a lung scan to check for pulmonary embolism as well as physical therapy ("PT"). *Id.* at 80–83.

On December 20, 2021, Mr. Beale went to the ER at Baptist Memorial Hospital in Memphis for treatment of chest pain, cough, shortness of breath, and sinus congestion. Ex. 6 at 1210. A chest CT scan showed no signs of pulmonary embolism, however, and his symptoms abated while under emergency care, and he was discharged home. *Id*. at 1210–11, 1213. A week later, he again sought emergency care—this time reporting his alleged DVT diagnosis, plus "worsening abdominal pain and distention as well as chest pain which is pleuritic in nature and shortness of breath." *Id.* at 97. He was tachycardic and appeared mildly short of breath, and he claimed to have been "bed bound for the last few weeks due to leg weakness." *Id.*

Petitioner was subsequently admitted to the hospital for further testing, and remained an in-patient until January 19, 2022. Ex. 6 at 142. His medical history was considered "notable for previous [upper respiratory infection] and diarrhea symptoms," and his receipt of the flu vaccine in October was memorialized as well. *Id.* at 142, 289. In addition, treaters noted that he had been receiving a statin thought to potentially be encouraging myopathy, and that more recently, his "ambulation ha[d] decreased and [he was] diagnosed with 2 DVT's and gout flares." *Id*.

On December 30, 2021, Petitioner received a neurology consultation from Dr. Pawan Virendra Rawal. Ex. 6 at 138–142. He informed treaters that since January 2021, he had been experiencing left foot numbness/weakness that over time had spread elsewhere, including to his right foot. Ex. 6 at 138. While hospitalized, Petitioner exhibited weakness and tingling in his legs, and he underwent diagnostic imaging—all of which yielded normal results. *Id.* at 142. An EMG,[4] however, showed velocity delays consistent with demyelination. *Id.*

---

[3] "Deep Vein Thrombosis" is defined as "thrombosis of one or more deep veins, usually of the lower limb, characterized by selling, warmth, and erythema; it is frequently a precursor of pulmonary embolism." *Deep Vein Thrombosis*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=113602&searchterm=deep+vein+thrombosis (last visited Apr. 8, 2026).

[4] "Electromyography" is defined as "an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation; performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals." *Electromyography*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15854&searchterm=electromyography (last visited Apr. 8, 2026).

*2022 Treatment and Beyond*

On January 6, 2022, treaters proposed that Petitioner begin receiving intravenous immunoglobulin[5] ("IVIG") and steroid treatment, due to the possibility that he was experiencing am inflammatory or autoimmune polyneuropathy. Ex. 6 at 88. The treatment was delayed after he developed a fever and signs of sepsis, but he ultimately received five doses of IVIG, with improvements in his strength. *Id.* During this time, hospitalist Dr. Salman Zafar conferred with Dr. Rawal, who noted that "he thinks [Petitioner] has inflammatory vs autoimmune such as CIDP vasculitis etiology high on differential," although he was "not sure about the role of vaccines in causing polyneuropathy." *Id.* at 272.

Petitioner was discharged to an inpatient rehabilitation facility on January 19, 2022. Ex. 6 at 88. His discharge diagnosis was listed as "Demyelinating vs inflammatory vs autoimmune polyneuropathy [with] concern for possible CIDP vasculitis." *Id.* at 89. Petitioner was told to follow up with his PCP, neurologist, hematologist, and rheumatologist on an outpatient basis. *Id.* at 88. While at the rehab facility, Petitioner completed eight days of inpatient physical and occupational therapy. *See* Ex. 12. When discharged from the facility on January 27, 2022, he could stand without assistance, walk with the help of a rolling walker, as well as perform most tasks of daily living without help. *Id.* at 188–89, 221–22.

After discharge, at the end of January 2022 Petitioner began seeing Dr. Rawal as an out-patient. Ex. 7 at 5. Petitioner reported persistent foot drop that was "somewhat improving" with exercise, had intact reflexes/sensations, and exhibited full strength and good muscle tone, apart from some foot drop. *Id.* at 5–6. Dr. Rawal assessed Petitioner with "Multifocal motor neuropathy" and "[d]emyelinating neuropathy" and recommended monthly IVIG treatments. *Id.*

On February 1, 2022, Mr. Beale underwent an outpatient PT evaluation. Ex. 11 at 53. In describing his symptoms history, he noted that he had received the flu and pneumococcal vaccines on October 27, 2021, and then, on the morning of November 5th, he recalled that he had "collapsed trying to get out of bed due to [his] left leg giving out and feeling paralyzed." *Id.* Petitioner visited an urgent care facility and was told he was suffering from diabetic neuropathy, but the treatment was not wholly effective. Thereafter, he had received additional treatment for gout, although his leg swelling recurred, and lower leg blood clots were evaluated. *Id.* Eventually, Petitioner observed his symptoms occurring on his right side/leg as well, and his ambulation difficulties plus a cough lead him to seek emergency care. *Id.* He subsequently (he reported) "was diagnosed with [G]uillain [B]arr[é] syndrome [and] had IVIG treatment which helped and his legs finally felt 'unlocked.'"

---

[5] "Intravenous Immunoglobulin" is defined as "[a] therap[y] prepared from a pool of immunoglobulins (antibodies) from the plasma of thousands of healthy donors. Immunoglobulins are made by the immune system of healthy people for the purpose of fighting infections … IVIG/SCIG work in different ways to prevent the body from attacking itself and to decrease several types of inflammation in the body." *Curry v. Sec'y of Health & Hum. Servs.*, No. 22-729V, 2025 WL 1693655, at n.4 (Fed. Cl. Spec. Mstr. Apr. 28, 2025).

*Id.* (There is no corroborative record setting forth a GBS diagnosis). A therapist recommended six weeks of outpatient PT. *Id*. at 56.

That winter and into early spring, Mr. Beale saw some improvement despite lingering leg weakness. Ex. 5 at 49, 55. He also continued PT into late March, which assisted him in ambulation, although he still observed inflammation in his ankles leading to swelling. Ex. 11 at 5, 61–66. An ultrasound of his lower extremities performed on April 12, 2022, revealed no evidence of DVT. Ex. 6 at 9.

On April 22, 2022, Petitioner went to rheumatologist David Boatright, M.D., for a consultation. Ex. 19 at 5. After a review of Petitioner's history of gout attacks and left ankle pain, Dr. Boatright opined that "crystalline arthropathy was the underlying diagnosis," although he noted an x-ray (which Petitioner declined due to issues with scheduling) of the affected ankle and foot would be needed for a complete evaluation. *Id*. at 6. Dr. Boatright disclaimed the ability to make any neurologic assessment of Petitioner, however.

From September 2022 to September 2023, Petitioner continued to see Dr. Rawal for a "serological and clinical diagnosis of multifocal motor neuropathy." *See* Ex. 8 at 4 (September 16, 2022 visit); *id*. at 7 (January 10, 2023 visit); *id*. at 10 (February 6, 2023 visit); Ex. 16 at 2 (March 15, 2023 visit); *id*. at 6 (April 6, 2023 visit); *id*. at 10 (September 25, 2023 visit). Petitioner reported worsening symptoms at the 2023 visits. During a visit on February 6, 2023, for example, he stated that he required the use of a walker "2-3 times a week," and was weaker compared to his "prior baseline, where he was independent and able to work out regularly in gym." Ex. 8 at 10. He had also developed wrist weakness—a "characteristic manifestation of underlying disease process." Ex. 16 at 6; Ex. 8 at 4. Petitioner had "not tolerated prednisone in the past" but was still using gabapentin. Ex. 16 at 10–11. Dr. Rawal continued to recommend monthly doses of IVIG, although Petitioner's insurance provider had purportedly initially declined coverage for this treatment. *See* Ex. 8 at 10.

Petitioner continued to visit his PCP for a variety of symptoms as well. At his last documented visit on February 12, 2024, he complained of pain and swelling in his left arm. Ex. 18 at 16–17. Petitioner's diagnoses included Stage 3 kidney disease, and he was referred to a nephrologist. *Id.* at 20–21. Petitioner's PCP also documented a history of CIDP and an upcoming neurology visit. *Id.*

On February 15, 2024, Mr. Beale was readmitted to the hospital with "worsening weakness and numbness in his right leg and left arm consistent with prior exacerbations." Ex. 17 at 15. Dr. Rawal, provided an inpatient consult for "CIDP/multifocal motor neuropathy." *Id*. at 37. Petitioner received three doses of IVIG and was discharged on February 17, 2024. *Id*. at 41. On February 21, 2024, Petitioner returned to neurologist Dr. Rawal for a follow-up. Ex. 42 at 5. The interval history

6

noted "CIDP exacerbation, was recently admitted in hospital." *Id*. But Petitioner's gait was normal, and he had trace and symmetric reflexes in his toes. *Id.* at 6.

## II.    Expert Reports

### A.    *Petitioner's Expert — Dr. Justin Willer*

Dr. Willer, a neurologist, prepared two reports in this matter. *See* Report, dated Sept. 18, 2024, filed as Ex. 22 (ECF No. 26-1) ("First Willer Rep."); Report, dated May 9, 2025, filed as Ex. 43 (ECF No. 30-1) ("Second Willer Rep.").

Dr. Willer received his undergraduate degree from Columbia College of Columbia University and his medical degree from the University of Health Sciences/The Chicago Medical School. Curriculum Vitae, filed as Ex. 23 (ECF No. 26-2) ("Willer CV") at 1. Since 1995, he has held hospital appointments at the University Hospital, Long Island College Hospital, Maimonides Hospital Medical Center, and Kings County Medical Center. *Id.* Additionally, Dr. Willer has held several academic appointments as a Neuromuscular Consultant and Assistant Professor of Clinical Neurology at the State University of New York, HSC at Brooklyn. *Id.* at 1–2. He is licensed to practice medicine in New York, New Jersey, and Florida, and he is board certified by the American Board of Psychiatry and Neurology, with added qualifications in clinical neurophysiology, and the American Board of Electrodiagnostic Medicine. *Id.* at 2, 3.

### *First Report*

Dr. Willer began his first report with a brief summary of the medical record evidence (including Respondent's Rule 4(c) evidentiary review). First Willer Rep. at 2–8, 17–21. He accepted Petitioner's CIDP diagnosis, and then provided an explanation of the condition's elements and nature. *Id.* at 9–14, 26. He deemed CIDP "immune mediated," and noted its different phenotypic classifications (although all include weakness/fatigue, with differences mainly lying in whether the form of CIDP is asymmetric, distal, and/or features sensory loss). *Id.* at 9, 11–12, 15.

CIPD, Dr. Willer noted, can be diagnostically confirmed by EMG testing; cerebrospinal fluid ("CSF") evidence of elevated proteins; and a number of clinical elements (recurrent extremity weakness over time, absent or reduced reflexes, and/or sensory dysfunction in limbs). First Willer Rep. at 9–11. It can present acutely, but will later become chronic (differentiating CIDP from GBS, which is monophasic in course), and even acute forms of CIDP do not typically require the same level of treatment (such as emergency measures to ensure proper breathing/ventilation). *Id.* at 11, 13. It also less commonly involves cranial nerve or autoimmune dysfunction. *Id.* at 11. While CIDP is most commonly thought (like GBS) to involve nerve demyelination, some axonal variants are thought to exist (although they may not then be appropriately classified as CIDP). *Id.* at 14.

7

Petitioner's CIDP diagnosis, Dr. Willer proposed, was supported by his late-December 2021 hospital presentation. First Willer Rep. at 23. By this time, he could not walk, displayed "proximal and distal weakness," and had absent or decreased reflexes. *Id.* IVIG treatments proved efficacious, but several months later in 2022 Petitioner experienced another weakness episode that lasted from September 2022 to February 2023 (although IVIG helped with this as well). *Id.* Because these two episodes "progressed over a period of more than 8 weeks," Petitioner's course of clinical symptoms was consistent with the diagnostic criteria for CIDP. *Id.* And Petitioner's positive response in each case to IVIG treatment was also confirmatory of the CIDP diagnosis. *Id.* at 24–25.

Dr. Willer acknowledged that EMG and nerve conduction testing results did not reveal the presence of demyelination that would be consistent with CIDP. First Willer Rep. at 23. But he emphasized the confirmation in these studies of "abnormal sensory responses" as somewhat consistent with CIDP otherwise (although Petitioner's preexisting diabetes was a complicating factor). *Id.* at 23–24. He also allowed that there was no CSF evidence supportive of the CIDP diagnosis, but denied its necessity for corroboration. *Id.* at 24. Otherwise, the totality of evidence established Petitioner's CIDP despite an inability to fulfill electrodiagnostic criteria. *Id.* at 25.

CIDP is known to be associated with certain monoclonal gammopathies[6], diabetes, and (Dr. Willer contended) vaccination. First Willer Rep. at 13; K. Kuitwaard et al., *Recurrences, Vaccinations and Long-Term Symptoms in GBS and CIDP*, 14 J. Periph. Nerv. Syst. 310 (2009), filed as 35 (ECF No. 26-14) ("Kuitwaard"), at 312 (Eight of 76 surveyed CIDP patients reported receiving vaccination within eight weeks of onset). Case reports also showed an association specific to the flu vaccine.[7] *See* J. Brostoff et al., *Post-Influenza Vaccine Chronic Inflammatory Demyelinating Polyneuropathy*, 37 Age Ageing 229 (2008), filed as Ex. 36 (ECF No. 26-15) (discussing a case of a 74-year-old man with a 10-week history of ascending weakness due to CIDP that began two days post-vaccination with response to IVIG and following a relapse steroid treatment); G. Remiche et al., *Chronic Inflammatory Demyelinating Polyradiculoneuropathy (CIDP) associated to Hereditary Neuropathy with Liability to Pressure Palsies (HNPP) and Revealed after Influenza AH1N1 Vaccination*, 113 Acta Neurol. Belg. 519 (2013), filed as Ex. 32 (ECF No. 26-11) (reporting a case of a 54-year-old woman with no previous neurological history, who developed CIDP five weeks after AH1N1 vaccine).

Dr. Willer further maintained that onset of Petitioner's CIDP, measured from his October

---

[6] "Monoclonal gammopathy is defined as "a condition in which an abnormal protein—known as monoclonal protein or M protein—is in [the] blood. The protein is produced in a type of white blood cell (plasma cell) in [the] bone marrow. [Monoclonal gammopathy' usually causes no problems. But sometimes it can progress over the years to other disorders …". *Wyatt v. Sec'y of Health & Hum. Servs.*, No. 14-706V, 2018 WL 7017750, at n.24 (Fed. Cl. Spec. Mstr. Dec. 17, 2018), *mot. for review den'd*, 144 Fed. Cl. 531 (2019), *aff'd*, 825 F. App'x 880 (Fed. Cir. 2020).

[7] Dr. Willer also discussed associations between other vaccines and CIDP. *See, e.g.*, First Willer Rep. at 15. But I only include a discussion herein of those items of literature more on point with respect to the vaccine at issue (influenza).

8

27, 2021 vaccination date, occurred in a medically acceptable timeframe. First Willer Rep. at 14, 26–27. Dr. Willer opined that onset occurred "somewhere between November 28 and 2 or 3 weeks prior" to Petitioner's late-December 2021 hospital admission—a timeframe of 32 to 54 days post-vaccination. *Id.* at 26. He maintained that studies established possible post-vaccine onset of "as short as 1-2 days to up to 8 weeks." K. Gable et al., *Distal Acquired Demyelinating Symmetric Neuropathy after Vaccination*, 14 J. Clinical Neuromuscular Disease 1, 1 (2013), filed as Ex. 33 (ECF No. 26-12) ("Gable") (*referencing* Kuitward at 312).

Dr. Willer acknowledged that it was not possible in this case (at least on the basis of the medical records) "to determine when the weakness in [Petitioner's] lower limbs started, given his gout-related ankle pain complaints and DVT concerns. First Willer Rep. at 21. But he gave weight to Dr. Rawal's evaluation in late December 2021–early January 2022, which seemed to confirm additional related symptoms beginning no earlier than late November. *Id.* at 21–22. He otherwise diminished the evidentiary value of pre-vaccination reports of foot weakness at times in 2021 well before the vaccination, opining that they were either unconfirmed, incorrect, or unrelated to Petitioner's primary complaints of distal weakness, adding that Petitioner had personally informed him that many symptoms began after onset (such as "electric shock like pain in his legs"). *Id.* at 22.

*Second Report*

Dr. Willer's second report responded to criticisms lodged against him by Respondent's expert, Dr. Pria Anand.[8] He began with some contentions about the nature of CIDP, and how in his view the diagnosis fits the facts of Petitioner's medical history. He maintained, for example, that relapses in symptoms comparable to what Petitioner experienced, even in the midst of treatment, are common to CIDP, adding the comment that Dr. Anand did not "understand" CIDP's nature. Second Willer Rep. at 2, 7.[9] He similarly questioned Dr. Anand's finding significance in Petitioner's report of a "marshmallow" sensation in his feet in mid-October 2021, denying not only that it was common to CIDP but adding that he had "never heard this description" in his professional life, and that Dr. Anand's attribution of this sensation to damage to nerve fibers that "supply joint position sense makes no sense." *Id.* at 3, 6.

Dr. Willer further proposed that Petitioner responded well to IVIG (indirect proof that Petitioner had experienced an autoimmune injury like CIDP). Second Willer Rep. at 7. Petitioner's

---

[8] Many of Dr. Willer's points relate to matters upon which resolution of the case does not turn, and therefore I do not address them herein. *See, e.g.*, Second Willer Rep. at 1, 6–7 (disagreement with Dr. Anand about the clinical features of multifocal motor neuropathy).

[9] This criticism of Dr. Anand is confusing. There appears to be no dispute between the parties that CIDP is inherently chronic, and will feature remitting/recurring symptoms. Dr. Anand's point was more that Petitioner's alleged positive response to IVIG treatment (offered as evidence supporting the CIDP diagnosis) was undercut by evidence of ongoing, progressive weakness involving Petitioner's arms and hands. *See* Ex. 8 at 4–7.

late-December 2021 presentation was markedly worse than the following month, by which time he showed significant improvement. *Id.* at 7-8.

Dr. Willer endeavored to explain away evidence of Petitioner's pre-vaccination neuropathic symptoms. He contended that "objective" weakness findings were only evident in the record from the post-vaccination period, with more ambiguous complaints of weakness before (although evidence of treater findings from the timeframe when the CIDP diagnosis was beginning to be proposed—based on when Petitioner was more actively seeking treatment) are not proof that the illness only post-dated vaccination. Second Willer Rep. at 4. And Dr. Willer denied that Petitioner's pre-vaccination complaints could be connected to "the proximal and distal weakness" evident from the record in the November-December 2021 timeframe. *Id*. at 5.

Dr. Anand had also failed, in Dr. Willer's view, in undermining the association between the flu vaccine and CIDP. Dr. Anand seemed to demand epidemiologic support for the association, even though that kind of evidence could only evaluate whether a given factor "increases the risk" of an adverse event. *Id.* at 9. But vaccination simultaneously *reduces* another risk (a particular kind of infection) that is not equivalent in effect, which (in Dr. Willer's view) "prevents one from using standard epidemiologic tools to show an excess occurrence of the event in a group of patients receiving vaccination." *Id;* J. Willer, *Reader Response: Guillain-Barré Syndrome in the Placebo and Active Arms of a covid-19 Vaccine Clinical Trial*, 97 Neurology 841 (2021).[10] Dr. Willer further maintained the case reports he had referenced were relevant, even if they involved CIDP variants or slightly different clinical findings. Second Willer Rep. at 9–10 (discussing Gable—a case review on the first reported cases of vaccine-associated distal acquired demyelinating symmetric ("DADS") neuropathy), 11. And other items of literature clearly allowed for the possibility that CIDP was associated with different pharmaceutical interventions (which would include vaccines). Second Willer Rep. at 10; P. van Den Berg et al., *European Academy of Neurology/Peripheral Nerve Society Guideline on Diagnosis of Chronic Inflammatory Demyelinating Polyradiculoneuropathy: Report of a Joint Task Force – Second Revision*, 26 J Peripher. Nerv. Syst. 242 (2021), filed as Ex. 27 (ECF No. 26-6) ("van Den Bergh").

Dr. Willer similarly defended items of literature he had filed to support the vaccine-CIDP association that Dr. Anand maintained involved the impact of vaccination on existing CIDP patients (and thus did not address initial vaccine causality). *See, e.g.*, J. Pritchard et al., *Risk of Relapse of Guillain-Barré syndrome or Chronic Inflammatory Demyelinating*

---

[10] This argument is exceedingly difficult to parse, and borders on the nonsensical. The fact that vaccines are intended to prevent a specific infection *in no way* means that the risk of a distinguishable adverse event cannot be evaluated by a properly-calibrated, methodologically-sound epidemiologic study. This is so even though (a) petitioners are not obligated by the Vaccine Program to prove causation *with* epidemiology, and (b) vaccine injuries are quite rare (meaning that epidemiology can never one hundred percent rule out causation). At most, Dr. Willer's argument could be understood to be that reduction of the risk of infection somehow also reduces the risk of CIDP (making it difficult in that context to assess risk from vaccination independently)—but if this is so, then once again the impact of vaccination is not shown to be likely causal of injury.

*Polyradiculoneuropathy following Immunisation*, 73 J Neurol. Neurosurg. Psych. 343, 348–49 (2002), filed as Ex. 37 (ECF No. 26-16) ("Pritchard"). He contended that there is "no reason to think that if a vaccine is associated with a relapse that this sheds no light on the risk of causation," adding that the fundamental physiologic responses in either case were the same. Second Willer Rep. at 11, 12. And he defended other articles that Dr. Anand deemed to succumb to reporting bias in their methodology (since they involved questionnaires rather than confirmed data), noting that they still involved large samples. *Id.* at 12; Kuitwaard at 311.

Dr. Willer also argued that it was erroneous to over-associate CIDP with some of Petitioner's preexisting comorbidities. Diabetes, he maintained, had only been shown to be a risk factor for CIDP in an older population. Second Willer Rep. at 3–4 (referencing Y. Rajabally et al., *Chronic Inflammatory Demyelinating Polyneuropathy Associated with Diabetes: A European Multicentre Comparative Reappraisal*,91 J. Neurol Neurosurg. Psych. 1100, 1100 (2020), filed as Ex. A, Tab 12 (ECF No. 27-13) ("Rajabally"), at 13. In fact, Dr. Willer maintained, studies reached inconsistent results as to the risk of CIDP in patients with diabetes. Second Willer Rep. at 13; R. Laughlin et al., *Incidence and Prevalence of CIDP and the Association of Diabetes Mellitus*, 73 Neurol. 39, 43 (2009), filed as Ex. 53 (ECF No. 30-11) (finding a univariate odds ratio for the prevalence of diabetes in CIDP of 0.3); Rajabally at 1100. At most, studies allowed for a possible association, rather than establishing causation. Second Willer Rep. at 13–14.

Moreover, "distal symmetric polyneuropathy" was the most common form a diabetes-related neuropathy, usually presenting with significant foot pain and dysthesias, followed much later on by distal weakness or sensory loss. Second Willer Rep. at 8; P. Dyck et al., *History, Diagnosis, and Management of Chronic Inflammatory demyelinating Polyradiculoneuropathy*, 93 Mayo Clin. Proc. 777 (2018), filed as Ex. 44 (ECF No. 30-2); G. Said, *Diabetic Neuropathy—A Review*, 3 Nat. Clin. Pract. Neurol. 331, 331 (2007), filed as Ex. 49 (ECF No. 30-49). The nerve damage featured in diabetes-associated cases of CIDP was not usually demyelinating in nature. Second Willer Rep. at 14; M. Garces-Sanchez et al., *Painless Diabetic Motor Neuropathy: A Variant of DLRPN?*, 69 Ann Neurol. 1043 (2011), filed as Ex. 4 (ECF No. 30-12). But Petitioner had experienced "a primarily motor neuropathy with profound weakness and loss of ambulation," making it distinguishable from what would otherwise be associated with diabetes. Second Willer Rep. at 8.

A Vitamin B12 deficiency was similarly, in Dr. Willer's view, an unlikely cause, since the medical records did not also show evidence of myelopathy due to "sub-acute combined degeneration." Second Willer Rep. at 8. Nor did Dr. Willer accept that Petitioner's illness could be viral in origin, regardless of some record evidence of an antecedent infection. *Id.* at 12. The actual medical record from the fall of 2021, he contended, did not confirm the existence of any gastrointestinal issues or infectious symptoms (despite later records asserting these had existed). *Id.* at 12–13.

11

B.      *Respondent's Expert — Dr. Pria Anand*

Dr. Anand—a neurologist like Dr. Willer—offered a single expert opinion on Respondent's behalf. Report, dated Jan. 27, 2025, filed as Ex. A (ECF No. 27-1) ("Anand Rep."). Dr. Anand contended that Petitioner had not experienced CIDP, and that any neurologic symptoms he may have displayed began pre-vaccination.

Dr. Anand attended Yale University for her undergraduate degree, and Stanford University for her medical degree. Anand Rep. at 1. She then completed an internship in Internal Medicine at the University of North Carolina Hospital and Clinics, followed by her residency in Neurology at Johns Hopkins Hospital. *Id.* Thereafter, Dr. Anand completed a fellowship in Infectious, Inflammatory, and Advanced General Neurology at Massachusetts General Hospital. *Id.* She is currently an Attending Physician and Assistant Professor of Neurology at the Boston University School of Medicine and the Boston Medical Center. Dr. Anand frequently evaluates patients with GBS and other neuroimmunologic syndromes in both an outpatient and inpatient setting. *Id.* She is board certified by the American Board of Psychiatry and Neurology, and she has also published extensively on topics in neurology. *Id.*

Like Dr. Willer, Dr. Anand began with a review of Petitioner's medical history and relevant post-vaccination course. Anand Rep. at 2–3. But Dr. Anand stressed certain aspects of that history in her opinion. In particular, Dr. Anand highlighted (a) the fact of Petitioner's preexisting diabetes and gout diagnoses, (b) the evidence of foot numbness in early 2021 that had spread to both feet, and (c) records (both contemporaneous and later) indicating that Petitioner had been experiencing pre-vaccination leg weakness as well. *Id.* at 2.

Dr. Anand did not accept CIDP as the proper diagnosis for Petitioner's presentation. Anand Rep. at 3–4. She defined CIDP to be an "immune-mediated syndrome characterized by loss of the myelin sheath," and that is recurrent/progressive in presentation. *Id.* at 5; van Den Bergh at 245. The diagnostic guidelines require clinical evidence of "proximal and distal weakness and sensory dysfunction of at least two limbs, developing over two months or longer, with absent or reduced tendon reflexes in all extremities." Anand Rep. at 5; P. van Den Bergh et al., *European Federation of Neurological Societies/Peripheral Nerve Society Guideline on Management of Chronic Inflammatory Demyelinating Polyradiculoneuropathy: Report of a Joint Task Force of the European Federation of Neurological Societies and the Peripheral nerve Society – First Revision*, 17 Eur. J. Neurol. 356 (2010), filed as Ex. A, Tab 4 (ECF No. 27-5).

A key feature of CIDP is that it is demyelinating, rather than "axonal" (meaning damaging to the actual nerve fibers). Anand Rep. at 5. As a result, evidence of the demyelination should appear from the electrodiagnostic testing results (although it can also be corroborated by other kinds of testing, such as CSF findings). *Id.* CIDP is also chronic/recurring over time (with second

symptoms presentations occurring within eight weeks of the first set), unlike the monophasic progression of GBS. *Id.*

In this case, Dr. Anand contended, the lack of electrodiagnostic testing results confirming the presence of demyelination made it unlikely the CIDP diagnosis was accurate. Anand Rep. at 5. And no other corroborative testing evidence, like the results of CSF analysis, existed to fill in this evidentiary hole. *Id.* Dr. Willer thus relied mainly on Petitioner's clinical symptoms, plus his favorable response to IVIG, as proof of the nature of Petitioner's illness. But Dr. Anand maintained that the record revealed that Petitioner experienced "objective progression of his weakness to involve his hands and arms" even in the midst of ongoing IVIG therapy, undermining the conclusion that he had responded well to the treatment. *Id.* Thus, Dr. Anand deemed Petitioner's symptoms overall too nonspecific to meet the CIDP criteria.

Whether or not Petitioner did have CIDP, Dr. Anand disputed the possibility that the flu vaccine could likely cause it. Anand Rep. at 6–7. She referenced "multiple studies" establishing that the risk of post-vaccination CIDP was no higher than control groups. *See, e.g.*, P. Doneddu et al., *Risk Factors for Chronic Inflammatory Demyelinating Polyradiculoneuropathy (CIDP): Antecedent Events, Lifestyle and Dietary Habits. Data from the Italian CIDP Database*, 27 Eur. J. of Neurology 136 (2019), filed as Ex. A, Tab 8 (ECF No. 27-9) ("Doneddu").[11] Dr. Willer, by contrast, had cited no studies that would show a flu vaccine-CIDP association (or a theory for how it would mechanistically occur), relying instead on case reports—a kind of evidence deserving limited weight in evaluating causation. Anand Rep. at 6–7. Some of the reports involved different vaccinations, too-quick onset timeframes, or did not cleanly involve CIDP itself. *See, e.g.*, Gable at 119 (documenting the first cases of post-vaccination DADS neuropathy); Brostoff at 3 (noting the initial presentation with facial numbness and dysarthria and the unresponsiveness after a second immunoglobulin course as unusual for CIDP); S. Tay & W. Chan, *A 9-Year-Old Female with Bilateral Leg Weakness after Influenza* Vaccination, 43 Pediatric Annals 440 (2014), filed as Ex. 34 (ECF No. 26-13) (discussing individual who developed bilateral leg weakness on the same day as an influenza vaccine).

Beyond that kind of evidence, Dr. Anand maintained, Dr. Willer had invoked papers that involved merely "the possibility of *relapse* in patients with underlying CIDP who receive vaccination." Anand Rep. at 7 (emphasis in original); Kuitwaard at 311 (finding that "[o]f the 24 patients who received the flu vaccination (range 1 – 17 times) after being diagnosed with CIDP, five reported an increase in symptoms after one or more vaccinations); Pritchard at 348 (stating

---

[11] I have previously been tasked with analyzing the relevance of the Doneddu article in similar cases and have explicitly stated that "I do not give substantial weight [] to articles like Doneddu, cited for the proposition that 'antecedent events' like vaccination were not likely causal—since all Doneddu's authors observed was that a *small percentage* of CIDP patients in the study had been vaccinated before onset." *See Houston v. Sec'y of Health & Hum. Servs.*, No. 18-420V, 2021 WL 4259012, at *18 (Fed. Cl. Spec. Mstr. Aug. 19, 2021) (involving the Tdap vaccine and CIDP).

that "[t]wo of 46 (4.3% patients with CIDP had relapses after influenza vaccine, of whom one had simultaneous pneumococcus vaccine")). And these articles did not even conclude there was a likely risk of relapse due to vaccine exposure (and did not in any event perform a reliable statistical evaluation to compare that risk to a control group). Anand Rep. at 7; Kuitwaard at 315 (noting study's limitation as a questionnaire, retrospective evaluation).

Dr. Anand also proposed alternative explanations for Petitioner's presentation. For example, there was Petitioner's well-documented set of pre-vaccination comorbidities. Anand Rep. at 5. Diabetes was known to have neuropathic secondary effects, and was thus a more likely cause of the kind of generalized symptoms Petitioner experienced. *Id.* Dr. Anand represented that "the literature supporting a relationship between diabetes and the development of CIDP is substantial," and offered many articles in support of the contention. *Id.* at 8; K. Sharma et al., *Demyelinating Neuropathy in Diabetes Mellitus*, 59 Arch. Neurol. 758 (2002), filed as Ex. A, Tab 9 (ECF No. 27-10) ("Sharma"); S. Kuwabara et al., *Chronic Inflammatory Demyelinating Polyneuropathy and Diabetes*, 91 J. Neurol. Neurosurg. Psych. 1035 (2020), filed as Ex. A, Tab 10 (ECF No. 27-11) ("Kuwabara") (explaining that "two studies from the USA proposed higher frequency of diabetes among patients with CIDP, compared with the general population"). Diabetes likely had this impact due to "increased activation of inflammatory factors" in the peripheral nerves of diabetes patients, coupled with general nerve breakdown due to the general neuropathic effects of diabetes, plus the possibility of "dysregulation of the blood vessels" that feed peripheral nerves, encouraging the kind of blood-nerve barrier breakdown needed to expose the nerves to inflammatory harm. Anand Rep. at 8; Kuwabara at 1035; S. Jaan et al., *Diagnostic Value of Sural Nerve Matrix Metalloproteinase-9 in Diabetic Patients with CIDP*, 61 Neurol. 1607 (2003), filed as Ex. A, Tab 13 (ECF No. 27-14).

In addition, the record revealed some evidence of a possible pre-onset infection. Anand Rep. at 6; Ex. 6 at 289. Dr. Anand admitted the role of infection in causing CIDP remained "unclear," but noted an association between antecedent infection and the acute form of CIDP had been observed. Anand Rep. at 6, 7; Doneddu at 138.

Finally, Dr. Anand addressed the onset of Petitioner's symptoms and their temporal relationship to his receipt of the flu vaccine in late October 2021. Anand Rep. at 6. Record evidence established that Petitioner's onset of weakness and foot numbness began not only the same month as vaccination, but nearly two weeks before (when Petitioner obtained urgent care treatment in mid-October 2021). *Id;* Ex. 3 at 2. Subsequent histories from his treatment in early January corroborated such a pre-vaccination onset. Ex. 6 at 138. There was actually proof that at least his foot numbness *long* predated vaccination (as acknowledged by Dr. Willer). Anand Rep. at 6; Ex. 6 at 138. Dr. Willer tried to downplay this evidence, arguing that the records did not permit a determination as to the nature or significance of these pre-vaccination symptoms, but Dr. Anand observed that "the urgent care center documents a very specific description of numbness"—the

feeling of "walking on marshmallows" (Ex. 14 at 3, 5)—that is "actually an extremely common description of sensory loss or numbness caused by neuropathy involving the large sensory nerves because of the loss of fibers that supply the body's sense of joint position in space." Anand Rep. at 6; *see also Neuropathy*, Active Health Clinics, https://theactivehealthclinics.com/post/Neuropathy (last visited Apr. 8, 2026), filed as Ex. A, Tab 5 (ECF No. 27-1) (listing "[f]eeling like you are walking on marshmallows or marbles" as a symptom individuals with neuropathy experience); *Peripheral Neuropathy*, Blue Mountain Wellness, filed as Ex. A, Tab 6 (ECF No. 27-2) (stating that "other symptoms [of neuropathy] may present which may include disrupted balance, the sensation of walking on marshmallows, …).

## III.    Procedural History

The case was initiated in August 2023. After Respondent's Rule 4(c) Report (filed in June 2024 (ECF No. 21)) contested the alleged GBS injury, I ordered the parties to address the dispute pertaining to the injury, as well as other matters raised in the Report. The parties filed the aforementioned expert reports, completing the process by May 2025. I subsequently set a schedule for briefing the claim via ruling on the record, and that process was completed in September 2025. The matter is now ripe for resolution.

## IV.    Parties' Arguments

*Petitioner*

Petitioner argues that his CIDP diagnosis is well supported by his clinical history, physical examinations, electrodiagnostic and laboratory evaluations, as well as the opinions of his treating physicians and Dr. Willer. Br. at 13. Dr. Willer considered diabetic neuropathy as causal of Petitioner's CIDP, but the most common presentation of diabetic neuropathy is distal symmetric polyneuropathy, which was not seen in Petitioner's clinical presentation. *Id.* at 15, 16. Relying on the EAN/PNS guidelines, Dr. Willer opined that on December 27, 2021, Petitioner was unable to walk, and three days later had proximal and distal weakness, decreased reflexes and absent ankle reflexes. *Id.* at 14; *see also* Ex. 22 at 23; Ex. 6 at 141. Moreover, nerve conduction studies revealed abnormal sensory response, and Petitioner experienced improvement following IVIG therapy. Ex. 6 at 141; Ex. 22 at 23–24. He also suffered a second episode of weakness in September 2022, which continued through February 2023, leading to a second course of IVIG. All of the above was enough to meet the clinical criteria for typical CIDP. Br. at 15; First Willer Rep. at 23.

With respect to the electrodiagnostic criteria, Dr. Willer deemed Petitioner's nerve conduction study results to be suggestive of demyelination—even though they literally did not meet the EAN/PNS guidelines for demyelination. Br. at 15. Nevertheless, a diagnosis of possible typical CIDP can still be made on the basis of other facts, such as evidence of objective

improvement following IVIG therapy. Here, Dr. Willer maintained that Petitioner clearly demonstrated objective improvement based on his ability to walk after his first course of IVIG therapy, as well as his positive response to a second course of IVIG following a relapse of weakness. *Id.*; Ex. 22 at 24. Although additional supportive criteria (i.e., CSF analysis or nerve biopsy) were not fulfilled herein, Dr. Willer argued that to satisfy that specific criteria exactly would require an unnecessary treatment course based on Petitioner's clinical basis, and the risk was too high for treaters to attempt a cervical tap to obtain a CSF analysis. Br. at 15.

Petitioner next addresses all three prongs of the test set forth by the Federal Circuit in *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) for causation. He began with *Althen* prong three. Br. at 16. Petitioner received the flu vaccine on October 27, 2021, and sixty-one days thereafter, presented to the ER reporting an inability to ambulate due to lower extremity pain, edema, and weakness and that he had been bed bound for two weeks. *Id.*; Ex. 2 at 32; Ex. 6 at 93. His first clinical manifestation was his proximal and distal weakness which started sometime between November 28, 2021, and 2–3 weeks prior to December 27, 2021 (i.e., between 33 to 52 days post-vaccination). Br. at 16; Ex. 22 at 22.

Dr. Willer opined that the onset of Petitioner's CIDP occurred "within the period expected for a post-vaccine autoimmune phenomenon in which the body's immune system mistakenly attacks the body's own tissue while responding to the vaccine." Br. at 19 (citing First Will Rep. at 26–27). Petitioner further acknowledged that there is medical record evidence that may suggest he experienced neurologic symptoms prior to his receipt of the flu vaccination, but argues that little weight should be afforded to such records as they are "internally inconsistent" and that even the author of the note from his urgent care visit on October 15, 2021, documented the uncertainty of the history provided by Petitioner. *Id.* at 17, 18; Ex. 14 at 3, 5 (stating "[u]nsure if [Petitioner's] [history] is accurate"); *see also* Ex. 21 at 11–31 (documenting history written by Dr. Rawal on 12/30/21 with Petitioner noting its inconsistencies with more contemporaneous records in May and June 2021).

The second, "did cause" prong was also met, given the preponderant evidence of a logical sequence of cause and effect showing that his vaccine likely caused his injury. Br. at 19. The neurological exam on December 30, 2021, revealed proximal and distal weakness, sensory loss in both feet, reduced reflexes, and absent reflexes, and EMG/NCS findings were consistent with sensorimotor neuropathy and suggestive of demyelination. *Id.*; Ex. 22 at 23–24; Ex. 6 at 677–682. Such findings, according to Dr. Willers, are "indicative of molecular mimicry between components of [Petitioner's] flu vaccine and myelin and is probative." Br. at 20. In addition, Dr. Willer considered alternative causes, including Petitioner's diabetes, but maintained that "[t]here is no basis for assuming that diabetes causes CIDP because nerve damage caused by diabetes does not have a predominant feature of primary demyelination." *Id.*; Second Willer Rep. at 13–14. And because there is a temporal proximity between Petitioner's receipt of the flu vaccine and the onset

16

of his injury, "it is logical to conclude that [Petitioner's] vaccine caused harm", according to Petitioner. Br. at 20.

Lastly, Petitioner briefly addressed the first, "can cause" *Althen* prong, explaining that he has submitted preponderant evidence of a reliable and persuasive causal theory. Br. at 20-21. Relying on several items of medical literature, he maintained that evidence existed for the proposition that both viruses and vaccinations have been associated with the development of acute and chronic inflammatory demyelinating polyneuropathy. *Id.*; *see also* Gable at 117; Pritchard at 348.

In his reply, Petitioner reiterates the arguments set forth in his initial brief. Specifically, he emphasizes that there is ample treater support for his CIDP diagnosis, that there is a lack of "convincing/preponderant evidence of pre-vaccination neurologic symptoms", and there is not only a logical sequence of cause and effect, but a medical theory causally connecting the vaccination to the onset of his injuries. *See generally* Reply at 2–6.

*Respondent*

Respondent maintains that Petitioner has not established by preponderant evidence that he suffers from CIDP. Opp. at 20. Petitioner's neuropathy likely preceded his receipt of the flu vaccine, as documented in the medical records. For example, on May 21, 2021—five months prior to vaccination—Petitioner presented to Internists of Churchland to establish care and for a routine physical exam, at which time he reported having pain and a "pins and needles" sensation in both feet that began in March 2021. *Id.*; Ex. 21 at 21, 23. Petitioner similarly reported worsening "pins and needles" sensation in his legs during a follow-up visit on June 8, 2021.

Moreover, as Dr. Anand explained in her reports, fulfillment of the clinical and electrodiagnostic criteria set forth by the EANS/PNS "is necessary for a diagnosis of CIDP" and here, Petitioner cannot show this important criterion is met. Opp. at 20–21. In addition, Petitioner's clinical course included "objective progression of weakness that involved his arms and hands even after the IVIG therapy", and thus, making a diagnosis of CIDP less likely. *Id.* at 21. And Petitioner had several other comorbidities (i.e., diabetes and borderline vitamin B12 deficiency) that are far more common causes of neuropathy, and his nerve conduction studies did not meet the electrodiagnostic criteria necessary for typical CIDP. *Id.* Accordingly, and absent any objective findings of CIDP, Respondent contends that Petitioner has failed to put forth preponderant evidence supporting a diagnosis of CIDP. *Id.* at 22.

As for the first "can cause" *Althen* prong, Respondent argues that Petitioner has failed to present reliable scientific evidence demonstrating that the flu vaccine can cause CIDP. Opp. at 23. Not only did Dr. Willer fail to provide a theory on how a flu vaccine can cause CIDP, but he does

not even provide a specific mechanism of causation, and merely summarizes Petitioner's medical records under the "specific causation" portion of his first report. *Id.*; *see also* First Willer Rep. at 17–21. Additionally, the items of literature Dr. Willer relied upon to support a causal connection between the flu vaccine and CIDP are essentially case reports that involved individuals with a diagnosis of CIDP that preceded vaccination, a too quick of onset, or a different condition. Opp. at 23.

Petitioner has similarly failed to satisfy the second "did cause" *Althen* prong. Opp. at 25. In response to Petitioner's assertion that his condition and clinical course are "consistent with a post-vaccine autoimmune phenomenon" and the lack of alternative causes, Respondent emphasizes that Petitioner's medical records place the onset of his presenting neurological symptoms before his October 27, 2021 vaccination, as well as document his extensive preexisting comorbidities. *Id.* at 25–26. And because Petitioner has failed to demonstrate that the flu vaccine can cause CIDP, he cannot also logically demonstrate that it did so herein. *Id.* at 26.

Lastly, Respondent maintains that Petitioner has also failed to offer sufficient preponderant evidence of a temporal relationship between the flu vaccine and his alleged CIDP. Opp. at 26. Petitioner's neurological symptoms predated his receipt of the flu vaccine. Specifically, Respondent takes note of the same appointment at which Petitioner received his flu vaccine— arguing that the medical records indicate Petitioner sought care at this time for a recent history of "nerve issues." *Id.* at 27. In addition, Petitioner presented to urgent care two weeks prior to his receipt of the flu vaccine with complaints of numbness in his feet, weakness in his legs, and the feeling of "walking on marshmallows." *Id.*; *see also* Ex. 14 at 3, 5. According to Dr. Anand, this is an "extremely common description of the sensory loss or numbness caused by neuropathy involving the large sensory nerves because of the loss of fibers that supply the body's sense of joint position in space." Opp. at 27; Anand Rep. at 6. Based on the consistency in the records demonstrating progressive symptoms well before his receipt of the vaccination at issue, Respondent argues that Petitioner has not shown a medically acceptable temporal relationship herein. Opp. at 28.

## V.    Applicable Legal Standards

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that she suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table— corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that her illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed.

Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[12] There is no Table claim for the injury of CIDP after receipt of any covered vaccine (and it is an exclusionary diagnosis for the somewhat-related Table claim of flu vaccine-caused GBS). 42 C.F.R. § 100.3(c)(15)(vi).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical

---

[12] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (May 6, 2015) ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (petitioner's contention that *Althen* prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

20

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir.

21

1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less

22

deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C.      *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are

23

employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.    *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir.

24

2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

E.       *Determination of Claim on Basis of Record*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Human Servs.*, No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Human Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *See Hovey v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

**ANALYSIS**

**I.       CIDP and Program Treatment of it as a Vaccine Injury**

CIDP generally is defined as "a slowly progressive, autoimmune type of demyelinating polyneuropathy characterized by progressive weakness and impaired sensory function in the limbs and enlargement of the peripheral nerves." *CIDP*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=99346&searchterm=chronic+inflammatory+demyelinating+polyneuropathy (last visited April 8, 2026). It typically results in weakness, numbness, paresthesia, and sensory ataxia that presents as relapsing-remitting, stepwise progressive, or gradually progressive, and more often than not involves motor and sensory nerve dysfunction. First Willer Rep. at 11; van Den Bergh at 245. Of note, some of the medical literature observes a higher risk of developing CIDP in patients with diabetes, although that risk is more commonly seen in an older population of diabetic individuals. *See* Rajabally at 1.

CIDP is often compared to GBS—another kind of inflammatory and demyelinating polyneuropathy characterized by an acute onset, rapid progression, symmetric muscle weakness and hyporeflexia or areflexia. *See DeVaughn v. Sec'y of Health & Hum. Servs.*, No. 22-832V, 2025 WL 758128 (Fed. Cl. Spec. Mstr. Feb. 10, 2025) (discussing the common overlap found in GBS and CIDP). But the conditions can be distinguished—and should be. GBS is monophasic and unresponsive to steroid treatment (unlike CIDP). *Nieves v. Sec'y of Health & Hum. Servs.*, No. 18-

1602V, 2023 WL 3580148, at *35 (Fed. Cl. Spec. Mstr. May 22, 2023), *mot. for review den'd*, 167 Fed. Cl. 422 (2023). In addition, GBS and CIDP are not understood to have the same self-targets for cross-reactive attack. *Mason v. Sec'y of Health & Hum. Servs.*, No. 17-1383V, 2022 WL 600415, at *26 (Fed. Cl. Spec. Mstr. Feb. 4, 2022).

Despite their differences, it is not uncommon for CIDP to present *initially* with symptoms comparable to what is featured in GBS—even acutely. Treaters thus often assume they are "seeing" GBS upon first examination and testing of a patient. Because of this overlap, Program petitioners may characterize CIDP as merely "long GBS." *See*, *e.g.*, *Nieves*, 2023 WL 3580148, at *35. The temptation to avoid distinguishing between the two diseases likely stems from the fact that GBS has been credibly linked to certain vaccinations (namely the influenza vaccine),[13] while the evidence supporting a causal link between CIDP and vaccines is less robust. *Id.* at *35 ("evidence that strongly supports a GBS-flu vaccine causal relationship rings weaker when applied to CIDP"). But it remains the case that CIDP and GBS are separate, immune-mediated polyneuropathies, even if they share many features. *See*, *e.g., Houston v. Sec'y of Health & Hum. Servs.*, No. 18-420V, 2021 WL 4259012, at *17 (Fed. Cl. Spec. Mstr. Aug. 19, 2021) (noting CIDP vs. GBS distinctions). It is therefore somewhat erroneous when deciding a Vaccine Act claim to treat CIDP and GBS as interchangeable. *See Nieves*, 2023 WL 3580148 at *36 ("[T]he overlap between GBS and CIDP cannot be employed as a shortcut to entitlement…").

Nevertheless, many Program decisions have assumed that the medical and scientific evidence supporting a GBS-flu vaccine link applies with the same force to CIDP. *See*, *e.g.*, *Jastisan v. Sec'y of Health & Hum. Servs.*, No. 13-937V, 2016 WL 4761950 (Fed. Cl. Spec. Mstr. Aug. 10, 2016). Special masters often lump GBS and CIDP together when the flu vaccine is at issue. *See*, *e.g.*, *Tomsky v. Sec'y of Health & Hum. Servs.*, No. 17-1132V, 2020 WL 5587365, at *5 (Fed. Cl. Spec. Mstr. Aug. 24, 2020) ("[F]or purposes of this decision I merely assume but do not decide that petitioner has established a medical theory causally linking the flu vaccine to CIDP"); *Strong v. Sec'y of Health & Hum. Servs.*, No. 15-1108V, 2018 WL 1125666, at *20 (Fed. Cl. Spec. Mstr. Jan. 12, 2018). I myself have done the same (albeit mostly motivated by a desire to adhere to past Program resolutions of such claims for the sake of judicial consistency). *Strong*, 2018 WL 1125666, at *20 (finding that the flu vaccine could cause CIDP).

But even if the leap from a flu vaccine-GBS connection to a comparable association with CIDP is not as great as that for other vaccines, there are very few *reasoned* decisions linking the

---

[13] Indeed, this causal evidence is the basis for a Table claim. 42 C.F.R. § 100.3.14 This means the Government has agreed that sufficiently-probative and reliable science on the topic exists to justify (in effect) conceding causation, at least for Program purposes. *Haskins v. Secretary of Health & Hum. Servs.*, No. 18-1776, 2020 WL 1870279 (Fed. Cl. Spec. Mstr. Mar. 13, 2020).

flu vaccine to CIDP.[14] Ultimately, there are enough questions about the issue to allow for reasoned dispute in causation cases involving CIDP and the flu vaccine—keeping in mind that all *three Althen* prongs must be met (so establishing causation alone only gets a claimant a third of the way).

## II.    Petitioner's Symptoms Likely Predated Vaccination

Axiomatically, a Vaccine Act claim cannot succeed if the petitioner's illness began *prior* to vaccination. *Locane v. Sec'y of Health & Human Servs.*, 99 Fed. Cl. 715 (2011) (finding that petitioner's Crohn's disease began prior to her vaccination and therefore vaccine causation could not be established).[15] Here, the record preponderates in just that conclusion, however. Thus, even if it were found that Petitioner had been *correctly* diagnosed with CIDP,[16] the record suggests his neuropathic symptoms began prior to his receipt of the flu vaccine.

The medical records filed in this case demonstrate that Petitioner was complaining of foot pain in the spring of 2021, months prior to his vaccination. Ex. 21 at 11–12, 16, 21–25. Although treaters were unable to identify a likely explanation, these kinds of seemingly-nonspecific symptoms are highly comparable to what developed post-vaccination. Moreover, the same month as vaccination, Petitioner reported worsening foot pain and leg sensations—the feeling of "walking on marshmallows," which as noted above is reasonably associated with CIDP. Ex. 14 at 3, 5. Petitioner was now thought possibly to be experiencing diabetic neuropathy. *Id.* at 5. The occasion of Petitioner's October 27, 2021 vaccination was a PCP visit specifically for treatment of these kinds of recent neuropathic symptoms. Ex. 2 at 24, 26–32. And then Petitioner informed Dr. Askandar in the late fall of 2021 that he had been experiencing symptoms "ongoing for about the

---

[14] I have, by contrast, often denied entitlement in cases where claimants attempted to link *other* vaccines with CIDP. *See, e.g.*, *Sanchez v. Sec'y of Health &Hum. Servs.*, No. 18-1012V, 2022 WL 1013264 (Fed. Cl. Spec. Mstr. Mar. 11, 2022) (Tdap vaccine not causal of CIDP).

[15] Claimants can of course argue that a particular vaccine worsened a preexisting illness or condition, by asserting a claim of "significant aggravation." *Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009). But no such claim (that Petitioner's CIDP was worsened due to the flu vaccine he received) has been propounded in this matter. Moreover, I do not discern on this record that a significant aggravation claim would have been tenable even if one had been propounded. The evidence in this case does not establish that the flu vaccine could worsen some other form of neuropathy (diabetic or otherwise), and Petitioner's own illness course is too stuttering and inconsistent to find that the vaccine sufficiently did worsen whatever he had before its administration.

[16] For present circumstances I will assume the CIDP diagnosis is established. However, Dr. Anand made a persuasive case for why Petitioner likely did not suffer from CIDP. Although Petitioner's symptoms progression has been chronic and remitting in nature (regardless of whether they began pre or post-vaccination), other evidence was inconsistent with the diagnosis. For example (and despite the fact that some aspects of EMG testing suggested the presence of demyelination), both experts allowed that electrodiagnostic testing did not yield results consistent with accepted criteria for CIDP. Anand Rep. at 5; First Willer Rep. at 23. There were no other corroborative test results, like CSF testing. Anand Rep. at 5; First Willer Rep. at 24. And improvement from IVIG was not well-substantiated, with equivocal evidence on the matter pro and con. At the same time, however, the clinical features of Petitioner's injury look much like CIDP, and certainly treaters considered it reasonably as a possible explanation.

past year." Ex. 2 at 11. The totality of this evidence strongly supports the conclusion of a likely pre-vaccination onset (even if only later was CIDP itself proposed as a diagnostic explanation).[17]

Dr. Willer's arguments on the topic of onset in comparison to date of vaccination were facially unpersuasive. Clearly Petitioner had numerous health risk factors for CIDP or some other kind of neuropathy. This includes his diabetes, which *is* associated with CIDP, even if the patient's age bears on the overall degree of risk. Rajabally at 1. Dr. Willer's blanket denial of ever having heard in his professional life the "walking on marshmallows" description of neuropathic sensations (Second Willer Rep. at 3, 6)—as if it was inconceivable for a patient to describe such a sensation in this way—was particularly difficult to swallow. Not only is this description of neuropathic symptoms consistent with literature filed in this case, but other Program claimants have *also* described neuropathic sensations in similar terms. *Nieves*, 2023 WL 3580148 at *2.

This record overall preponderates in favor of a finding of pre-vaccination onset. As a result, the vaccine cannot have caused his symptoms.

## CONCLUSION

Because Petitioner did not carry his preponderant burden of showing causation, I am compelled to deny compensation.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[18]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[17] This evidence also underscores the strong possibility that Petitioner's neuropathy, however understood diagnostically, was actually the product of diabetes or some other comorbidity Petitioner suffered from—although I need not determine the actual/most likely cause of Petitioner's illness to deny entitlement, since it most likely had begun as of the date of vaccination.

[18] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.